UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALTRIA GROUP, INC.,

Plaintiff,

- against -

UNITED STATES OF AMERICA,

Defendant.

1:06-cv-09430-RJH-FM

**MEMORANDUM OPINION
AND ORDER**

---

Richard J. Holwell, District Judge:

This case concerns federal income tax deductions plaintiff Altria Group Inc. and its subsidiary Phillip Morris Capital Corp. ("PMCC" or "Altria," collectively with plaintiff) generated by leasing big pieces of infrastructure from tax-indifferent counterparties. These tax shelter transactions are known in the leasing industry as SILOs ("Sale-In-Lease-Out") and LILOs ("Lease-In-Lease-Out"). Following a two-week trial, the jury concluded on the facts presented to it that plaintiff's SILOs and LILOs lacked economic substance and failed to transfer tax ownership of the properties to Altria, thereby justifying disallowance by the IRS of certain deductions claimed by Altria. Several courts and another jury have reached similar conclusions in other jurisdictions. *See BB&T Corp. v. United States*, 523 F.3d 461 (4th Cir. 2008); *AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953 (N.D. Ohio 2008); *Fifth Third Bancorp & Subs. v. United States*, 05 Civ. 350 (S.D. Ohio, April 18, 2008) (jury verdict); *Wells Fargo & Co. v. United States*, 91 Fed. Cl. 35 (Fed. Cl. 2010). *But see Consolidated Edison Co. v. United States*, 90 Fed. Cl. 228 (Fed. Cl. 2009).

The four transactions in the present case relate to Altria's acquisition of leasehold interests in the Long Island Railroad's primary maintenance facility, a Dutch wastewater treatment plant, and two power plants in Georgia and Florida.  Each of the counterparties was indifferent to U.S. federal income tax, in the sense that the ability to depreciate or amortize the assets would not substantially affect the entities' tax liability.  In each transaction, Altria immediately leased the asset back to its original owner using agreements with a number of unusual features, including complete defeasance (prepayment, in essence) of the lessee's rent and an owner's option to repurchase the asset.  Altria then claimed depreciation, amortization, interest expense, and transaction expense deductions on its 1996 and 1997 corporate tax return based on its newly acquired assets, even though (i) its purchase money immediately was invested in securities that the nominal lessees could not access without providing substitute collateral, and (ii) the lessees could reacquire the assets without incurring any out-of-pocket costs.

From the perspective of the U.S. Treasury, these and similar transactions entered into by Altria created billions of dollars of tax-deferral benefits out of thin air.  The Commissioner of Internal Revenue concluded that the transactions had no purpose, substance, or utility apart from their anticipated tax consequences and disallowed the deductions.  Altria filed this suit, arguing, in substance, that because it complied with certain standards developed for traditional leveraged leasing transactions, it was entitled to the challenged deductions.

From June 23 to July 9, 2009, the Court held a jury trial to determine Altria's entitlement to the deductions.  At the close of evidence, Altria moved for judgment as a matter of law, and the Court reserved decision on the motion.  After the jury returned a

verdict for the Government on all of Altria's claims, Altria renewed its motion and moved in the alternative for a new trial.

For the reasons that follow, the motions will be denied.

## I.   BACKGROUND

### A.   The Transactions

The four transactions that gave rise to the challenged deductions are seemingly complex.  Each transaction, however, shares the same basic structure, which is helpfully summarized in a series of memoranda that PMCC's credit department prepared for senior Altria management at the time PMCC entered into the transactions.  (*See* GX 107 ("Oglethorpe Mem."); GX 257 ("MTA Mem."); GX 304 ("Vallei Mem."); GX 407 ("Seminole Mem.").)  The description that follows is drawn primarily from those memoranda.  To simplify the discussion, several details that are irrelevant for purposes of this opinion, such as the special purpose entities and trusts through which the transactions were implemented, are omitted.

PMCC is a financial services company that focuses on investments and leveraged leasing.  (Tr. 123.)  In each transaction, PMCC acquired a leasehold interest in an asset that originally was owned by a governmental entity or an electrical cooperative.

The "MTA" transaction involved the Hillside Maintenance Complex in Hollis, Queens, the primary maintenance facility for the Long Island Rail Road's rail cars.  As described in the transaction's credit memorandum, the facility "is a unique and essential asset to the viability of the Long Island Rail Road and the MTA."  (MTA Mem., at ALT0016431.)  "The modern 900,000 square foot Facility, possessing the latest advances in industrial engineering, robotics, and computer technology, is required to meet the repair and maintenance needs of the LIRR well into the twenty-first century."  (*Id.*)  The

complex originally was owned by the New York Metropolitan Transportation Agency (the "MTA"), a public benefit corporation of the State of New York.  (*Id.* at ALT0016430.)  As an agency of a state government, the MTA is not subject to federal income taxation for purposes relevant to this case.  *See* 26 U.S.C. § 115 (1994).

The "Oglethorpe" transaction involved an interest in the Rocky Mountain power plant, an 848 megawatt pumped storage hydroelectric facility.  The plant, located in Floyd County, Georgia, is used to provide "peak" power to customers of the Oglethorpe Power Corp., themselves electric utilities.  During periods of low electricity demand, it uses electricity from the public grid to pump water into a reservoir on top of a mountain. Then, during periods of peak demand, gravity propels water through the plant's turbines to generate electricity.  As described in the Oglethorpe credit memorandum, the plant "fills a major gap for Oglethorpe which had been buying peaking capacity under contract to meet short-terms needs."  (Oglethorpe Mem., at ALT 0003524.)  At the time the transaction was entered into, Oglethorpe had over a billion dollars in net operating losses, thus the ability to claim deductions for wear and tear on the plant would not have had a substantial effect on its federal tax liability.  (Tr. 896, 900.)

The "Seminole" transaction involved a 625 megawatt coal-fired electrical generating unit, known as "Unit 1," that is located in Palatka, Florida.  The plant originally was owned by the Seminole Electrical Cooperative, Inc, an electrical cooperative similar to Oglethorpe.  According to the transaction's credit memorandum, the unit "accounts for approximately 50% of Seminole's generating capacity and is indispensable for Seminole's operations."  (Seminole Mem., at ALT002543.)  This transaction terminated in accordance with the terms of the parties' agreement.  (Tr. 1959.)

Thus, there presently is no possibility that Altria will be required to take possession of Unit 1.

The "Vallei" transaction involved a wastewater treatment facility in the Netherlands.  Like other wastewater treatment facilities that have been leased to American investors, the facility at issue here accelerates the biological processing of wastewater.  (Vallei Mem., at ALT0001032.)  The credit memorandum opined that such facilities "represent critical assets to the efficient, safe and economical treatment of wastewater for the inhabitants of the Gelderland, Utrecht and Noord Holland provinces of The Netherlands."  (*Id.* at ALT0001025.)  The facilities originally were owned by Watershap Vallei en Eem, an independent agency of the government of the Netherlands that is responsible for the treatment of wastewater within its assigned geographic region.  (Vallei Mem., at ALT0001019- ALT0001020.)  As an agency of a foreign government, Vallei is not subject to U.S. federal income tax for any relevant purposes.

As noted, each of the four transactions had two principal components: a "head" lease and sublease.  In the head lease, the tax indifferent entity initially leased the asset (or a percentage interest in the asset) to Altria.  In three of the four transactions (Oglethorpe, Seminole, and Vallei), the head lease extended beyond the useful life of the asset and thus transferred tax ownership.  (Tr. 248.)  In the remaining transaction (MTA), the head lease did not extend past the asset's useful life and thus did not transfer tax ownership.  (*Id.*)  The relationship between the head lease term and an asset's appraised useful life accounts for whether a transaction was denominated a SILO ("sale in-lease

out") or LILO ("lease in-lease out"), as well as whether Altria purported to acquire a depreciable or amortizable interest in the asset.[1]

PMCC immediately leased the asset back to the tax indifferent entity through a sublease whose term was shorter than that of the head lease. Each sublease had a "basic" term that lasted for approximately the amount of time the transaction was expected to generate positive tax benefits. (*See, e.g.*, Mulligan Demonstrative 25.) At the conclusion of the sublease, the tax-indifferent lessee had the right to repurchase the asset for an amount slightly greater than the asset's expected fair market value. (*See, e.g.*, Mulligan Demonstrative 26.) If the lessee did not exercise this purchase option, PMCC could take possession of the facility or put the lessee to additional obligations. The nature of these obligations varied depending on the transaction.

In the MTA, Seminole, and Oglethorpe transactions, PMCC could unilaterally require the lessee to renew the lease for an additional "renewal" term. In the MTA transaction, this term lasted for twelve years (MTA Mem., at ALT0016428-29); in the Oglethorpe transaction, it lasted for sixteen years (Oglethorpe Mem., at ALT000351516); and in the Seminole transaction, it lasted for approximately fifteen years. (Seminole Mem., at ALT0025401-02.) The Vallei transaction had a slightly different structure, in which PMCC could require Vallei to enter into a service contract for the operation of the wastewater treatment facility. The governing agreements required Vallei to return the facilities under "stringent" return conditions, and, at PMCC's option, enter into a contract

---

[1] To simplify the discussion, this opinion refers to the attempted "sale" of a "depreciable" interest in the assets, even though the MTA transaction involved an attempt to transfer an amortizable interest in the Hillside Maintenance Complex.

in which a third-party operator acceptable to PMCC would operate the facilities for an additional sixteen years.  (Vallei Mem., at ALT0001022-23.)

Following the renewal or service contract term, the governing agreements contemplate a brief period during which Altria will be required to take possession or otherwise dispose of the asset.  In the MTA transaction, this period lasts for 9.2 years, or approximately twenty percent of the Hillside Maintenance Complex's appraised useful life; in the Oglethorpe transaction, it lasts for thirteen years, or approximately twenty-two percent of the hydroelectric plant's appraised useful life; in the Seminole transaction, it lasts for 9.2 years, or approximately twenty percent of Unit 1's appraised useful life; and in the Vallei transaction, the period lasts for 19.73 years, or approximately thirty-four percent of the wastewater treatment facility's appraised useful life.  (*See, e.g.*, Mulligan Demonstrative 32 (collecting sources).)  At trial, the Government contended that the appraisals these estimates were based on were entitled to little weight.

The following diagram, a summary of the Seminole transaction reproduced from Altria's summary judgment brief, illustrates the transactions' basic structure:



(Altria Summ. J. Mem. 15.)

During the initial and renewal lease terms, the lessees assumed significantly all of the traditional benefits and burdens of ownership, including the obligation to pay property taxes, insurance, maintenance, and regulatory costs.  (*See, e.g.*, PX 150, at OGL015401, OGL0154005-06.)  Altria's claim that it acquired a depreciable interest in the assets therefore is based on the possibility that, in a given transaction, the lessee will not exercise its purchase option; the transaction will not unwind pursuant to a subsequent agreement of the parties (as in fact occurred in the Seminole transaction); the appraised useful life of the asset is reasonably accurate; and the appraised residual value of the asset is reasonably accurate.  If and only if each of these conditions is met, Altria will take possession of an asset with substantial economic value during the "tail" or "residual" period of the head lease.  Interestingly, the MTA, Oglethorpe, and Seminole memoranda assume, with varying degrees of certainty, that the lessee will exercise its purchase option at the conclusion of the basic lease term.  (MTA Mem., at ALT0016431; Oglethorpe Mem., at ALT0003518; Seminole Mem., at ALT0025404.)  And each credit memorandum assumes that the asset will have no residual value at the end of the renewal or service contract term.  (MTA Mem., at ALT0016429; Oglethorpe Mem., at ALT0003516; Seminole Mem., at ALT0025402; Vallei Mem., at ALT0001023.)

**B.      Differences Between the Challenged Transactions and a "Traditional" Leveraged Lease**

A substantial amount of evidence addressed whether the transactions were materially different from a traditional leveraged lease.  In a traditional leveraged lease, the owner of an asset such as an airplane sells the asset and immediately leases it back under a long-term lease.  (*See, e.g.*, Tr. 137-30.)  The original owner benefits from monetizing an illiquid asset, while the lessor benefits from rental income and the ability

to depreciate the asset for tax purposes.  While the tax treatment of such transactions can be difficult,[2] the parties generally agreed that Altria was entitled to the challenged deductions if the transactions it entered into are nothing more than examples of a "time honored leveraged lease."  During trial, however, at least five differences between the transactions and such a lease were apparent.

First, the jury heard evidence from which it could have concluded that the transactions involved assets that are qualitatively different than those found in typical leveraged leasing transactions.  (*See, e.g.*, Tr. 1260-61, 1349-51.)  In particular, the jury could have found that there was no viable secondary market for the assets, so that in each transaction, Altria and its counterparty effectively entered into a bilateral monopoly in which the asset's price after the transaction's closing would be determined by non-economic factors.  Altria introduced some evidence to the contrary.  (*See, e.g.*, Tr. 1250-52.)  But the jury was free to reject the inference that Altria sought to draw—that (for example) the secondary markets for Dutch wastewater treatment facilities and commercial aircraft are equally viable.

Second, the jury heard evidence from which it could have concluded that the transactions involved assets that were essential to the lessees.  PMCC's credit memorandum, for example, generally described the leased assets as critical to the lessees' business operations.  *See supra* § I.A.  And PMCC's former president testified that the company sought to invest in assets of "strategic importance."  (Tr. 1331.)

---

[2] *Compare, e.g.*, *Sun Oil Co. v. Commissioner.*, 562 F.2d 258 (3d Cir. 1977) (disallowing deductions arising out of a two-party sale-leaseback involving a tax-exempt trust), *with Frank Lyon Co. v. United States*, 435 U.S. 561, 583 n.18 (1978) (approving deductions arising out of a three-party sale-leaseback that, in the Supreme Court's view, did not result in a loss of revenue to the U.S. treasury, and citing *Sun Oil* favorably).

Third, the jury heard evidence from which it could have concluded that the appraisals that parties relied on to set key transactional terms, including the assets' nominal sale price, did not properly estimate the assets' expected residual value and expected useful life, and incorrectly predicted that the lessees would not exercise their purchase options at the end of the basic subleases.  For example, one of Altria's appraisers testified that although the transactions involved assets worth hundreds of millions of dollars, he spent an average of one week on each appraisal.  (Tr. 615.)  A transactional lawyer from the MTA testified that the purpose of the appraisal was simply to support Altria's tax position.  (Tr. 514-15.)  Altria's counterparties generally did not receive a copy of the appraisals before the transactions closed.  (Tr. 515, 621-22, 749-50.)  And although PMCC's internal staff uniformly expected the lessees to exercise their purchase options, no one at PMCC or the firms that performed the appraisals ever questioned the appraisals' conclusions to the contrary.  (Tr. 443.)  In short, while the appraisals have the trappings of a serious inquiry into the assets' commercial value, the jury reasonably could have concluded that they were little more than window dressing designed to bolster Altria's tax position.

Fourth, because each counterparty was indifferent to U.S. federal income tax, the transactions had the effect of creating tax benefits rather than transferring a tax benefit between taxpayers that paid comparable tax rates.  Logically, one would not expect this to affect whether a nominal owner acquired a depreciable interest in leased property.  *See* Bernard Wolfman, *The Supreme Court in the* Lyon*'s Den: A Failure of Judicial Process*, 66 Cornell L. Rev. 1075, 1098 (1981).  The Supreme Court, however, has expressly indicated that a transaction's effect on the U.S. treasury must inform a federal court's

analysis of whether a transactional form chosen selected by a taxpayer should be respected for federal tax purposes.  *See Frank Lyon Co. v. United States*, 435 U.S. 561, 580.

Fifth, in each transaction, the lessee's rent and purchase-option price were fully "defeased."  As a result, the lessee did not receive any additional liquidity aside from an amount that was directly traceable to the tax benefits created by the transactions.  This unusual feature worked as follows:

At the beginning of a transaction, the lessee momentarily received a sum of money in exchange for granting a leasehold to Altria.  Approximately four-fifths of this money consisted of non-recourse financing obtained by Altria.  The remaining money was provided by Altria and represented Altria's "equity" investment in the asset.  After paying sizeable transaction fees and setting aside an amount less than the tax benefits created by the transaction, the lessee immediately transferred the purchase money it received from Altria into two bank accounts: a "debt" defeasance account, and an "equity" defeasance account.

The debt defeasance account was established at an affiliate of the financial institution that provided the non-recourse financing and was governed by an agreement whereby the financial institution, known as the "debt payment undertaker," was required to make periodic payments out of the account's proceeds.  These payments were structured so that on each date when a payment was due from PMCC to the lender, a corresponding rent payment was due from the lessee to PMCC, and a matching payment was due from the debt payment undertaker to the lessee.  When a lease payment came due, the debt payment undertaker and the lending bank (the same bank) made offsetting

entries on their books discharging the parties' various payment obligations.  (*Compare, e.g.*, PX 157, at OGL016813-14, *with* PX162, at OGL017322-23, *and* PX 150, at OGL015537-38; *see also* Tr. 218-19.)

The equity defeasance account was established at a second financial institution and was governed by a separate agreement, known as an "equity funding agreement." The funds in this account generally were invested in U.S. treasury bonds, and were used to make any sublease payments not funded by payments from the debt defeasance account.  With interest, the equity account accreted to an amount sufficient to pay the lessee's purchase option price at the end of the initial lease term or the obligations to which PMCC could put the lessee.  (*Compare, e.g.*, PX 150, at OGL015420, *with* PX 162, at OGL17324, *and* PX 165, at OGL017371; *see also* Tr. 221-22, 226.)  The lessee was prohibited from accessing the money in the defeasance accounts unless it provided substitute collateral acceptable to Altria.  (*See, e.g.*, PX 165, OGL017358-59; *see also* Tr. 219-23.)

Appendix A to this opinion, the wiring instructions from the Oglethorpe transaction's closing, illustrates the creation of the defeasance accounts and the essentially circular flow of purchase money through the lessee to the debt and equity payment undertakers.  Note in the diagram that Utrecht-America Finance Co., the provider of non-recourse financing, and Rabobank Nederland NY, the debt defeasance account holder, are affiliates.

## C.    Procedural History

Altria filed its complaint on October 16, 2006.  The complaint claimed tax refunds arising out of nine transactions; however, the Court on February 14, 2007, entered a stipulation providing that the case would be litigated based on the four

transactions described above.  (*See* Docket No. 17.)  Following extensive discovery, the

Court denied cross-motions for summary judgment, finding genuine issues of material

fact concerning, inter alia, the practical economic effect of the transactions' defeasance

structure, the level of financial risk that Altria assumed, and whether Altria and its

counterparties could point to any legitimate business purpose for entering into the

transactions.  *See Altria Group, Inc. v. United States*, No. 06 Civ. 9430, 2009 WL 874207

(S.D.N.Y. Mar. 31, 2009).

From June 23 to July 9, 2009, the Court held a jury trial to determine Altria's

entitlement to the claimed deductions.  Altria introduced testimony from four fact

witnesses and three expert witnesses.  The Government introduced testimony from two

fact witness and four expert witnesses.

At trial, the parties advanced different views of the transactions' purposes and

effects.  Altria argued that the transactions were ordinary leveraged leases, and that it

necessarily acquired a genuine ownership interest in the assets because it attempted to

comply with guidelines originating in Revenue Procedure 75-21.  Thus, Altria argued that

it had "skin in the game," because "we actually put out own money into the deals" (Tr.

2046); that "we structured these transactions so there would be years, literally years, of

opportunity for us to have an upside or a down side" (Tr. 2050); that it priced the lessees'

purchase options higher than the assets' expected fair market value "so that no one could

argue that we set some nominal value" that would compel the lessees to exercise their

options (Tr. 2053); that it stood to earn a substantial non-tax-based profit from the

transactions (Tr. 2028); and that "[e]ach one of these transactions has [a] residual term

structured into [it] where we have the potential to get back the asset and we'll have the risk that it may go down in value or the benefit that it may go up [in] value" (Tr. 2046).

Consistent with its theory that the transactions are materially indistinguishable from a traditional leveraged lease, Altria argued that the transactions' defeasance structure had no effect on whether it acquired depreciable interests in the assets.  (*See, e.g.*, Tr. 2071 ("[T]here is nothing magical about defeasance.  It is a form of security that secures obligations under an agreement.").)  Even with defeasance, Altria was exposed to the risk that the financial institutions holding the defeasance accounts would fail—a so-called "strip risk."  (*See id.*)  And defeasance did nothing to eliminate the possibility that Altria would have to take possession of the assets at the end of the sublease renewal term. (*See id.*)  Altria argued, finally, that the transactions had "economic substance" (*see infra* § II.B), because it would earn a non-tax-based profit of 2.5% to 3.8% if the transactions unfolded as expected.

The Government argued that the transactions' sole purpose was to create tax benefits, and that the transactions did not have any substantial effects aside from the creation of such benefits.  The Government illustrated this contention by pointing to the fact that the debt financing, equity financing, and assets in the transactions flowed in a series of loops.  Beginning with the debt financing, money flowed from the lending bank, to Altria (momentarily), to the lessee (momentarily), then to a debt defeasance account at an affiliate of the lending bank.  Unless something quite unexpected happened, the "financing" would return to the originating bank through offsetting book entries.  (Tr. 2124-26.)  Altria's "equity" investment followed a similar path.  After this money momentarily was transferred to the lessee, it returned to an equity defeasance account

- 14 -

where it accreted to an amount sufficient to cover Altria's economic exposure.  (Tr. 2130-32.)  The money then returned to Altria, either when the lessee exercised its purchase option, or when Altria put the lessee to a renewal term or service contract.

As for the facilities, the Government urged the jury to reject the suggestion that Altria acquired a genuine ownership interest because of the possibility that it would take possession of the assets following the basic sublease term or during the head lease residual.  A cost-benefit analysis prepared by one of the Government's experts demonstrated that Vallei would always exercise its purchase option because of the onerous costs of the service contract PMCC could put it to.  (Tr. 2144.)  While this did not hold true for the remaining transactions, a simple decisional analysis that focused on the lessee's options at the end of the basic lease term, and that took account of endowment effects and status quo bias, demonstrated there was almost no possibility that Altria would be required to take possession of an asset with any substantial economic value.[3]  If an asset appreciated relative to the value of the lessee's equity defeasance account, the lessee would exercise its purchase option and thereby capture the difference between the asset's market value and the value of the account.  (Tr. 2151.)  If an asset did not substantially appreciate or depreciate relative to the value of the defeasance account, the lessee would still exercise its purchase option, because (i) doing so did not involve any out-of-pocket costs, (ii) the asset was critical to the lessee, and (iii) a rational lessee would not allow Altria to capture the remaining value in the head lease residual by putting it to a renewal term that would exhaust the defeasance account, which would

---

[3] An "endowment effect" is a phenomenon in which an individual or a firm values an asset that it possesses more highly than an equivalent asset it does not possess.  *See generally* Daniel Kahneman, Jack L. Knetsch, & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persps. 193 (1991).

otherwise revert to the lessee.  (Tr. 2015-17.)  Of course, an asset could unexpectedly

depreciate during the basic sublease term, as would happen if developments in alternative

energy sources made coal-fired power plants obsolete, or the residents of the Netherlands

no longer needed to dispose of wastewater.  (*See* Tr. 2151.)  But in this event, PMCC

would recover its full economics by putting the lessee to a renewal term, and the asset it

would be left with at the end of that term would, by hypothesis, not have a substantial

economic value that could depreciate.  The Government thus implied that the only real

risk of ownership Altria bore was the risk that an asset would unexpectedly depreciate

during the basic sublease term; in this circumstance, however, the transaction's

defeasance structure totally insulated Altria from economic loss.  The Government

concluded that it was entirely speculative that Altria would ever assume the ordinary

benefits and burden of property ownership.  Regardless of whether the lessee exercised

its purchase option, "it's a debate over whether [Altria] gets nothing or practically

nothing."  (Tr. 2140.)

   The Government also argued that the transactions lacked economic substance.

Although Altria expected to earn a small pretax return, the return took decades to realize

and was economically inconsequential in relation to the tax deferral benefits created by

the transactions.  Furthermore, the contemporaneous documents overwhelmingly

demonstrated that Altria entered into the transactions for the exclusive purpose of

obtaining large tax-deferral benefits.  Thus, the Government concluded that any profit

Altria stood to realize through the deals was window dressing designed to disguise their

real purpose—tax avoidance.  (*See* Tr. 2156.)

The Court instructed the jury to analyze the transactions under the two common law disallowance methods relied on by the Government: the "substance over form" doctrine, and the "economic substance" doctrine.  With respect to substance-over-form, the Court instructed the jury to put aside the labels used or names given to the documents and transactions, and decide whether Altria actually acquired and retained a genuine ownership interest in the Seminole, Oglethorpe, and Vallei facilities, and a genuine leaseback interest in the MTA facility.  The jury was to consider "all the relevant facts and circumstances surrounding the transactions," including eight non-exclusive factors identified by the Court.[4]  (Charge to the Jury, at 33-34 (Docket No. 146).)  At the same

---

[4] The factors, as they appeared in the Court's charge, are as follows:

1. **Control Over the Facility**.  Whether Altria acquired and retained significant and genuine attributes of an owner/lessor, or whether the other party in the transaction – Seminole, Oglethorpe, Vallei, or the MTA – retained significant control over the facility;

2. **Equity Investment**.  Whether Altria made a meaningful equity investment in the facility, and whether Altria was at risk of losing its equity investment;

3. **Cash Flows**.  Whether there were significant cash flows between the parties to the transaction;

4. **Business Realities**.  Whether the transaction was motivated by legitimate business purposes, or solely by a desire to create tax benefits;

5. **Regulatory Realities**.  Whether the transaction was motivated by the regulatory or legal environment in which the parties to the transaction were operating;

6. **Residual Useful Life**.  Whether, at the time the transaction began, the facility had an expected useful life beyond the leaseback that Altria could benefit from.  In considering this factor, you may consider the options available to the parties at the end of the initial leaseback, including the likelihood that the lessee would exercise its purchase option;

time, the Court cautioned the jury that its analysis should turn on the facts as it found

them, including its understanding of how the transactions were designed to unfold:  "You

must consider and give the appropriate weight to all the relevant facts and circumstances.

In the end, the question is whether Altria retained significant and genuine attributes of

traditional owner (or lessor) status."  (*Id.* at 34.)

With respect to the economic substance doctrine, the Court instructed the jury that

"[a] transaction lacks economic substance if it has no business purpose or economic

effect other than the creation of tax deductions."  (*Id.* at 38.)  The jury was to give greater

weight to objective facts about the transactions than to a participant's statement of intent.

In addition, the Court instructed the jury not to consider the present value of future cash

flows in determining whether the "economic effect" prong was satisfied.  (*Id.* at 40.)

While the jury could consider the present value of future cash flows in determining

whether Altria acted with a legitimate business purpose, it was to find for Altria on the

economic effect prong if "the amounts Altria reasonably expected to receive exceed the

amounts Altria invested in the transaction."  (*Id.* at 40.)

---

7. **Residual Value**.  Whether, at the time the transaction began, it was reasonable to expect that the facility would have meaningful value at the end of the leaseback that Altria could benefit from.  In considering this factor, you may consider the options available to the parties at the end of the initial leaseback, including the likelihood that the lessee would exercise its purchase option; and

8. **Residual Value Risk**.  Whether, at the time the transaction began, Altria had the potential to benefit from an increase in the facility's value and suffer a loss of its equity investment in the facility as a result of a decrease in the facility's value.  In considering this factor, you may consider the options available to the parties at the end of the initial leaseback, including the likelihood that the lessee would exercise its purchase option.

The Court further instructed the jury that the economic substance test was flexible.  If the jury found with respect to a particular transaction that Altria lacked a business purpose other than tax avoidance, or lacked a potential for profit beyond the creation of tax benefits, it was entitled to find that the transaction should not be respected for tax purposes.  The jury, however, was to consider both the "business purpose" and "economic effects" inquiries before reaching a conclusion as to the economic substance of a transaction.  (*See id.* at 38-39.)

As noted, the jury returned a verdict for the Government.  The verdict forms clearly indicated that the jury accepted the Government's basic contention that the transactions had no purpose, substance, or utility apart from their anticipated tax consequences.  Using separate forms for each transaction, the jury found that: (i) Altria did not acquire a genuine ownership interest in the leased facilities (or a genuine leasehold interest in the MTA facility), which would entitle it to depreciation, amortization, and transaction expense deductions, and (ii) the transactions did not have economic substance.

Altria timely renewed its motion for judgment as a matter of law and moved, in the alternative, for a new trial.

## II.       DISCUSSION

The Court may grant judgment as a matter of law if a reasonable jury would not have a legally sufficient evidentiary basis to find for a party on an issue.  Fed. R. Civ. P. 50(a)(1).  Judgment as a matter of law is appropriate if "viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can

be but one conclusion as to the verdict that reasonable men could have reached." *Merrill Lynch Interfunding v. Argenti*, 155 F.3d 113, 120 (2d Cir. 1998) (internal quotation marks omitted). In considering a motion for judgment as a matter of law, the Court "must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor." *Id.* (internal quotation marks omitted). Following a jury trial, the Court may order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), including prejudicial evidentiary error. *E.g.*, *Boyce v. Soundview Tech Group, Inc.*, 464 F.3d 376, 389 (2d Cir. 2006).

Altria contends that it is entitled to judgment as a matter of law under both of the common law disallowance methods the Government relied on at trial. With respect to the substance over form doctrine, Altria maintains that the jury gave undue weight to evidence that has no bearing on whether it acquired a depreciable interest in the assets, and that several of the specific indicia of ownership the Court instructed the jury to consider were misleading. As for the economic substance doctrine, Altria contends that once it demonstrated that it reasonably expected to generate a non-tax-based profit of 2.5% to 3.8%, the transactions were immune from scrutiny. Finally, Altria contends that it is entitled to a new trial because of a number of evidentiary errors.

In the Court's view, none of these arguments withstands careful analysis. Below, the Court first considers the "substance over form" doctrine. The Court then turns to the "economic substance" doctrine, although the jury's "substance over form" verdict is independently sufficient to support judgment in favor of the Government. Finally, the Court briefly addresses Altria's motion for a new trial.

- 20 -

**A.      Substance Over Form**

Section 167(a) of the Internal Revenue Code allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) . . . (1) of property used in the trade or business, or (2) of property held for the production of income."  The deduction is designed to permit the cost of property to be recovered by the party who bears the burden of "wear and tear," normally, the property's owner.  *See Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 254 (1939).  Whether a taxpayer possesses such an interest is a question of federal law determined by the substance and economic realities of the transaction that gave rise to the asserted interest.  *See id.*  While "agreements which were intended to have economic substance, as opposed to mere tax avoidance, should be given effect for tax purposes," *Newman v. Commissioner*, 902 F.2d 159, 163 (2d Cir. 1990), the Government, in appropriate cases, may disregard the niceties of form and legal title in determining a transaction's tax consequences.  *See, e.g.*, *Lazarus*, 308 U.S. at 255; *TIFD III-E, Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006) ("*Castle Harbour*").  A pointlessly complex transaction with a tax-indifferent counterparty that insulates the taxpayer from meaningful economic risk of loss or potential for gain cries out for such treatment.

**1.      The Appropriate Indicia of Ownership in a LILO/SILO Transaction**

As described above, the Court took an inclusive approach to evidence of whether Altria acquired a depreciable interest in the assets, allowing the jury to consider the totality of the circumstances in which the transactions were entered into and a number of ways of measuring their economic and financial effects.  While Altria maintains that this was error, the Court is of the view that this approach was both mandated by precedent

and necessary to avoid hiding material features of the transactions from the jury's consideration.

To begin with, an inclusive approach was mandated by *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), a decision the Second Circuit has dubbed "[t]he touchstone in determining whether the form of an agreement should govern" for tax purposes. *Newman*, 902 F.2d at 163. *Frank Lyon* considered the federal income tax consequences of a transaction in which an Arkansas bank, the Worthen Bank & Trust Co., sold and leased back a bank building as it was constructed. Worthen initially planned to finance and construct the building itself. *Frank Lyon*, 435 U.S. at 563. However, federal and state regulators prohibited it from carrying mortgaged property on its balance sheet. *See id.* at 563-64. Worthen accordingly devised a plan whereby an "investor" would secure a mortgage loan, pay for the building to be constructed, assume title to the building as it was constructed, and immediately lease the building back to Worthen.

As this plan was implemented, the investor, plaintiff Frank Lyon Co., provided $500,000 of its own money, plus $7,140,000 in financing from the New York Life Insurance Company to pay for the building. *Id.* at 564, 566. The initial leaseback period lasted for twenty-five years, and was subject to options to repurchase the building after eleven, fifteen, twenty, and twenty-five years. *Id.* at 567. Worthen further acquired the right to extend the lease for eight, five-year terms. *Id.* at 566. It granted a ground lease to Lyon for the land underlying the building that lasted ten years longer than the building lease. *Id.* at 566. Lyon then claimed that it acquired a depreciable interest in the building and took corresponding deductions on its corporate tax returns.

In some respects, the transaction was similar to the transactions at issue here.  For example, Lyon's lease to Worthen was "triple-net," meaning the lessee was required to pay maintenance, insurance, and taxes during the lease term.  *Id.* at 567.  Worthen's rent payments during the initial twenty-five year lease precisely covered Lyon's debt service.  *Id.* at 566.  And the purchase options were structured so that if Worthen reacquired the building, its purchase money would repay the then-outstanding New York Life debt, along with Lyon's $500,000 investment with six-percent compound annual interest.  *Id.* at 567.

Although the Government argued that the transaction "was but a conduit used to forward the mortgage payments, made under the guise of rent paid by Worthen to Lyon, on to New York Life as mortgagee," *id.* at 573, the Supreme Court held that Lyon was entitled to the deductions.  In reaching this conclusion, it is difficult to overstate the scope of the evidence the Supreme Court relied on.  As a provocative commentary notes, the Court assayed at least twenty-five factors in concluding Lyon was entitled to the deductions.  Michael H. Simonson, *Determining Tax Ownership of Leased Property*, 38 Tax Lawyer 1, 17 (1984); *see also id.* at 18 ("[T]he only enduring principles that can be derived from the majority opinion [in *Frank Lyon*] are that no single test is determinative of ownership and that each case must be decided on its own complex and numerous facts and circumstances.").  The factors included Lyon's status as the party "whose capital was committed to the building," *Frank Lyon*, 435 U.S. at 581; Lyon's primary liability on the note to New York Life, *Frank Lyon*, 435 U.S. at 576; the fact that Lyon's return depended on the rent it would receive during the final ten years of its ground lease if Worthen put Lyon to the available extensions of the lease, *id.* at 579; the "regulatory

realities" that prompted Worthen to structure the transaction in the manner it did, *id.* at

583; and the competitive bidding between firms that sought to invest in the building, *id.*

at 576.  The Court also emphasized, in contrast to this case, that the transaction did not

create any tax deductions, because Lyon and Worthen paid taxes at the same rate.  *Id.* at

580.  *But see* Wolfman, *supra*, at 1095-98.  It disclaimed any intention to identify a set of

factors that would determine tax ownership in all cases, noting that the "significant and

genuine attributes of the traditional lessor status . . . in any particular case will necessarily

depend upon its facts."  *Frank Lyon*, 435 U.S. at 584.

Although *Frank Lyon* addressed the exact issue raised by this case—which party

is entitled to claim a depreciation deduction in a sale-leaseback transaction that insulates

a nominal owner from many of the traditional benefits and burdens of ownership—Altria

contends that all but five of the criteria the Supreme Court relied on are irrelevant to

whether it acquired a depreciable interest in the assets.  Specifically, Altria contends the

exclusive criteria for determining tax ownership are elaborated in a series of the Tax

Court's post-*Frank Lyon* opinions, which generally hold that in a multi-party leasing

transaction, the relevant indicia of ownership are those articulated in an advance ruling

guideline, Revenue Procedure 75-21.[5]  *See, e.g.*, *Levy v. Commissioner*, 91 T.C. 838, 860

---

[5] The Court in *Frank Lyon* summarized these factors as follows:

> In general "[u]nless other facts and circumstances indicate a contrary
> intent," the Service will not rule that a lessor in a leveraged lease
> transaction is to be treated as the owner of the property in question unless
> (a) the lessor has incurred and maintains a minimal investment equal to
> 20% of the cost of the property, (b) the lessee has no right to purchase
> except at fair market value, (c) no part of the cost of the property is
> furnished by the lessee, (d) the lessee has not lent to the lessor or
> guaranteed any indebtedness of the lessor, and (e) the lessor must
> demonstrate that it expects to receive a profit on the transaction other than
> the benefits received solely from the tax treatment

(1988); *Estate of Thomas v. Commissioner,* 84 T.C. 412, 433-38 (1985).  According to

Altria, a taxpayer's compliance with these factors is the beginning and end of the inquiry

into whether the taxpayer acquired a depreciable interest in an asset via a leasing

transaction.  Altria argues, for instance, that it does not know of a case where a court has

charged a jury to follow *Frank Lyon* instead of relying on its preferred five-factor test.[6]

---

*Frank Lyon*, 435 U.S. at 579 n.14.  The Court noted, "[t]hese guidelines are not intended to be definitive . . . ."  *Id.*

[6] *But cf. Am. Realty Trust v. United States*, 498 F.2d 1194 (4th Cir. 1974), in which the trial judge instructed the jury as follows:

> The issue in this case is whether the transaction between the plaintiff, American Realty Trust, and Helmsley was a good faith purchase and leaseback or was it a financial arrangement.  By financial arrangement is meant this. Was this an arrangement which, regardless of its form, had as its purpose and effect the ownership of the property by Helmsley with American Realty Trust merely lending money secured by the property. To put it another way—in substance, as opposed to just form—was American Realty Trust the real owner of the property which it leased to Helmsley or was Helmsley the real owner of the property on which American Realty Trust held in effect the mortgage.  In making this determination you should consider the following indicia of ownership—I mean, earmarks of ownership—no one of which is controlling: 1.Who had the actual command or control over the property? 2. What economic results were intended by the parties; and what were those economic results? 3. Whether American Realty Trust paid a price for the property which was equal to its fair value? * * *  4. Who was to bear the various expenses on the property including repairs, taxes, insurance, maintenance, and whether it was normal for that party to bear them.  5. Who was to bear the risk of loss in event of destruction of the property?  6.  The length of the lease, and the length of the lease with reference to the useful life of the property.  7. The option to repurchase—and its terms, including the amount to be paid if the option was exercised.  8. Who would get the benefits of any appreciation that occurred in the value of the property? 9. Did the payments made by Helmsley resemble rent or did they resemble payments on a loan? 10. For whom, Helmsley or American Realty Trust, was the equity by the amortization of the mortgage being built up—that is, who would get this equity in event of repurchase by Helmsley?  * * *  You are instructed that the determination of whether the transaction between the American Realty Trust and Harry Helmsley was a purchase of American Realty Trust and a leaseback to Helmsley or whether it was a loan to Helmsley by American

(*See* Tr. 1964-65 ("I do not know of a case after Frank Lyon that has looked to Frank

Lyon to say here are the sets of factors that a jury should be instructed on. . . . [T]he

courts have spent a lot of effort amplifying the leasing guidelines.").

      Given that Altria declined to seek an advance ruling as to the tax consequences of

these transactions, and that it was free to file this action in the Tax Court, *see* 26 U.S.C.

§ 6214, there is a through-the-looking-glass quality to its argument that this Court should

disregard *Frank Lyon* and limit its consideration to indicia of ownership noted in

Revenue Procedure 75-21.  But in any case, Altria's argument reflects an understanding

of the relationship between the Supreme Court, lower Article III courts, and the Tax

Court that is at the very least strange.  This Court respects the Tax Court's views and for

that reason charged the jury to consider each of the indicia of ownership relied on by

Altria.  (*Compare* Altria Mem. 42 *with* Charge to the Jury, at 33-34.)  To say, however,

that the Tax Court's decisions identify the exclusive criteria for determining which

taxpayer is entitled to a depreciation deduction would be to ignore the essential holding

of *Frank Lyon*, that whether a taxpayer possesses a depreciable interest in a leased asset

must be determined through a fact-intensive analysis focused on the "substance and

economic realities" of the challenged transaction.  *Frank Lyon*, 435 U.S. at 582.  Altria

does not simply ask this Court to find that the Tax Court has "underruled" the Supreme

Court, but to hold that as a result of the Tax Court's "clarification" of the law, the jury

---

      Realty Trust and a mortgage put on by Helmsley in favor of American
      Realty Trust turns in part on the intention of the parties.

*Id.* at 1197 n.11.  As one side of the circuit split that prompted the Supreme Court to issue
a writ of certiorari, *see* 435 U.S. at 572, *American Realty Trust* was implicitly affirmed
by *Frank Lyon*.

was precluded from giving weight to a number of material features of the transactions.  In the Court's view, the law does not require such an anomalous result.

Altria protests that it relied in good faith on the indicia of ownership articulated in Revenue Procedure 75-21.  (*See* Altria Mem. 47.)  It charges that, by challenging LILO/SILO transactions but not other leveraged leases, the Government is seeking to change settled understandings of the law in a manner proscribed by *United States v. Byrum*, 408 U.S. 125 (1972).[7]  This argument, however, is legally and factually flawed.

Legally, Altria could justifiably rely on the Tax Court's decisions only if they considered transactions that are materially similar to the ones at issue.  But that is hardly the case here.  While the decisions Altria cites concededly consider *leasing* transactions, not one of them considers the tax consequences of the sale and leaseback of a critical piece of municipal infrastructure from a tax-indifferent counterparty in a transaction in which the "lessee's" rental obligations and purchase options are fully defeased, and the lessor is insulated from any meaningful economic risk of loss or potential for gain.  Of course, that is unsurprising, for the LILO/SILO transaction structure's heyday was not until the 1990s.  *See* Maxim Shvedov, *CRS Report for Congress: Tax Implications of SILOs, QTEs, and Other Leasing Transactions with Tax-Exempt Entities* 8 (Nov. 30, 2004).  Altria's reliance argument also depends on the manifestly false factual premises that Altria is a naïve investor that did not appreciate the novelty of the LILO/SILO

---

[7] In *Byrum*, the Supreme Court cautioned that "[w]hen a principle of taxation requires reexamination"—there, the rule of *Reinecke v. N. Trust Co.*, 278 U.S. 339 (1929)— "Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences."  408 U.S. at 135.  As this Court reads *Byrum*, the Government does not violate this canon of construction by challenging abusive transactions using common law disallowance methods the Supreme Court has expressly recognized.

structure or the tax risks inherent in the structure.  But it did.  For example, an agenda from PMCC's 1996 "closing meeting," dated January 21, 1997, notes that while the LILO structure "is now 'popular' as a tax shelter," it "is being scrutinized by the IRS." (GX 15, at 1.)  The agenda continues to note that that the "[r]isk of IRS attack grows should PMCC increase its portfolio of such assets." (*Id.*)  These hardly are the sort of comments one would expect from an innocent investor relying on "well-established and well-understood" principles of tax law.

At the risk of beating a dead horse, any remaining doubt as to the propriety of analyzing the transactions under *Frank Lyon*'s inclusive approach is dispelled by the Government's power in a tax-refund case to rely on any legally cognizable disallowance method.  A highly-instructive example of this doctrine is provided by the Second Circuit's recent decision in *Castle Harbour*.

The real party in interest there, General Electric Credit Corp., was a financial services company that specialized in leveraged leasing.  In the transaction that gave rise to the case, GECC formed a partnership with two Dutch banks with the apparent purpose of allocating taxable income to the banks.  The banks contributed $117 million cash to the partnership, and GECC contributed leased aircraft with a value of approximately $272 million.  *See TIFD III-E Inc. v. United States*, 342 F. Supp. 2d 94, 98, 100 (D. Conn. 2004).  The partnership, exploiting the partnership allocation rules, allocated ninety-eight percent of the taxable income it realized under the aircraft leases to the Dutch banks for tax purposes.  *Id.* at 101.  The banks, however, received far smaller actual distributions limited to "net book income," an accounting construct defined to exclude depreciation the IRS would not recognize because it already had been claimed by GECC.  *See id.* at 102-

03.  Through provisions in the partnership agreement and other contractual undertakings, the parties effectively ensured that the banks would recover their initial investment at an annual rate of return of approximately nine percent.  *See id.* at 103, 105-06.  The banks' upside and downside potential was otherwise severely limited.

The District Court acknowledged that by assigning taxable income to the tax-indifferent banks, the arrangement effectively allowed GECC to "re-depreciate" its aircraft and thereby obtain a large tax-deferral benefit.  *See id.* at 107.  It found, however, that the transaction had economic substance, because the Dutch banks undertook some risk and had the potential for some upside.  *See id.* at 109-11.  The court then found, based largely on its economic-substance finding, that the Dutch banks were bona fide partners under the totality-of-the-circumstances test of *Commissioner v. Culbertson*, 337 U.S. 733 (1949).  The thrust of its analysis was that because "*the transaction that created Castle Harbour* was not a sham," 342 F. Supp. 2d at 113, the Dutch banks necessarily acquired a genuine partnership interest under *Culbertson*.  *See id.* at 113-14.[8]

On appeal, the Second Circuit held that the District Court erred, among other reasons, by relying on economic substance concepts to the detriment of the *Culbertson* analysis.  The court explained that "[t]he IRS . . . is entitled in rejecting a taxpayer's characterization of an interest to rely on a test less favorable to the taxpayer, even when the interest has economic substance."  *Castle Harbour*, 459 F.3d at 231.  It added, "[t]he IRS's challenge to the taxpayer's characterization [of the banks' 'partnership' interest] is

---

[8] On remand, the District Court contended that it had not slighted the *Culbertson* analysis and reinstated the claimed tax benefits on an alternate basis.  *TIFD III-E Inc. v. United States*, 660 F. Supp. 2d 367, n.1 (D. Conn. 2009).  Though the proper interpretation of the District Court's original opinion reasonably could be debated, it does not affect the point developed in the text.

not foreclosed merely because the taxpayer can point to the existence of some business purpose or objective reality in addition to its tax-avoidance objective." *Id.* at 232. Considering all the facts surrounding the transactions, the court concluded that "[t]he Dutch banks' interest was in the nature of a secured loan, with an insignificant equity kicker." *Id.* at 241.

As in *Castle Harbour*, there is a degree of logical fit in this case between several common law disallowance methods and the transactions that generated the tax benefits the Government now challenges. *Castle Harbour*, however, teaches that the Government enjoys the benefit of the resulting legal uncertainty, and is not limited to the test most favorable to the taxpayer's position (here, the judicially-developed test originating in Revenue Procedure 75-21). As long as *Frank Lyon* remains good law, then, the Government is entitled to rely on it in cases that fall within the scope of the principles it announced.

**2.    Altria's Objections to Specific Indicia of a Depreciable Interest Charged by the Court**

Altria contends in the alternative that even if an inclusive approach was proper, at least six of the specific factors noted in the Court's charge to the jury misled the jury or allowed it to give undue weight to irrelevant evidence. Many of these objections are insubstantial or simply reargue Altria's position that the five-factor test originating in Revenue Procedure 75-21 defines the metes and bounds of the substance-over-form inquiry.[9] Two other objections merit more discussion.

---

[9] Altria's argument that the jury should have been instructed to ignore "[w]hether there were significant cash flows between the parties to the transaction" (Charge to the Jury 34) would effectively immunize the transactions from scrutiny under the step-transaction doctrine. *See Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994). While rent geared to debt service is a common feature in leveraged leases, the jury was entitled to

Purchase options.  Altria first argues that the Court erred by instructing the jury to consider "the likelihood that the lessee would exercise its purchase option."  (Charge to the Jury 27.)  In Altria's view, this instruction was erroneous because "the case law uniformly holds that a purchase option is problematic only when the purchase option is *certain* or *nearly certain* to be exercised."  (Altria Mem. 55.)  There are a number of possible responses to this interesting argument.

First, it is not clear that Altria's point is anything more than semantic.  To consider whether an option is "certain" or "practically certain" to be exercised, the

conclude that the cash flows here—which were not only geared to debt service, but ensured that "financing" never left the control of the originating bank—were a different kettle of fish.

Altria similarly argues that the court erred by allowing the jury to place weight on the fact that the transactions were fully defeased, because "[t]here are . . . numerous examples of cases in which courts have upheld the lessor as owner where payments under the lease were certain or virtually certain . . . because the lessor's investment was protected by additional security as in the case here."  (Altria Mem. 62.)  But note the legerdemain:  Defeasance is a "neutral" factor only if, as a practical financial matter, it is equivalent to other forms of security.  That was a key factual dispute at trial.

Altria contends that whether it acted with a bona fide business purpose is irrelevant to whether it acquired a depreciable interest in the assets.  (Altria Mem. 74.)  *Frank Lyon*, however, recognizes the relevancy of this factor, and for good reason:  "Ownership of personal property passes according to the intent of the parties, and all other rules are auxiliary to that rule."  73 C.J.S. Property § 61 (2009).  Under the logic of *Frank Lyon*, the absence of a legitimate business purpose suggests the absence of intent to transfer ownership of a *res*.  *See Frank Lyon*, 435 U.S. at 583-84 (noting transaction was "compelled or encouraged by business or regulatory realities" and "imbued with tax-independent considerations"); *cf. Am. Realty Trust*, 498 F.2d at 1199 ("There was considerable evidence in the record to the effect that the intent of the parties, acting in complete good faith, was to undertake a sale to ART with a subsequent lease-back to Helmsley.").

In its least substantial objection, Altria says that it was error to allow the jury to consider "[w]hether the other party in the transaction – Seminole, Oglethorpe, Vallei, or the MTA – retained significant control over the facility," (Charge to the Jury 33), because "[b]y definition, a lease involves a transfer of possession and control over the asset to the lessee during the lease term."  (Altria Mem. 44.)  True enough, but this skirts the important issue—whether the "lessee" retained *permanent* control over the "leased" asset.  *Cf. Frank Lyon*, 435 U.S. at 572-73.

factfinder must assess the "likelihood" that the option will be exercised; a "practical certainty" is just another way of saying a very high likelihood.  Altria, of course, was free to argue that the transactions' purchase options would only prevent it from acquiring a genuine ownership interest in the assets if they were certain to be exercised—and it did. (Tr. 2053.)  But for reasons discussed momentarily, the jury was entitled to reject this formalistic view of the transactions.

Second, none of the appellate decisions cited by Altria in fact holds that a purchase option is problematic only if it is certain or nearly certain to be exercised.  In *Breece Veneer & Panel Co. v. Commissioner*, 232 F.2d 319 (7th Cir. 1956), the court rejected the Government's argument that a lease was really a conditional sales contract because the lessee "hoped" to exercise its purchase option, but it did not address how likely the exercise of an option must be to support the conclusion that the taxpayer did not acquire a depreciable interest in an asset.  *Id.* at 323.  The court in *Lockhart Leasing Co. v. United States*, 446 F.2d 269 (10th Cir. 1971), noted that a purchase option price was "related realistically" to expected market value; but again, it did not address how likely the exercise of a purchase must be to support the conclusion that the taxpayer did not acquire a depreciable interest in an asset.  *Id.* at 272.  The same holds true for *American Realty Trust*, 498 F.2d 1194, and *Benton v. Commissioner*, 197 F.2d 745 (5th Cir. 1952).

The most significant flaw in Altria's argument, however, is that it misunderstands a legitimate theory of the case advanced by the Government.  In contrast to a case involving a traditional leveraged lease, the Government here did not argue that Altria would not acquire the benefits and burdens of ownership only if a lessee exercised its

purchase option.  (*See, e.g.*, Tr. 2149.)  Instead, the Government argued that there were a number of scenarios, including, but not limited to, those where the lessee exercised its purchase option, in which Altria would never take possession of the assets.  The cumulative effect of these scenarios, according to the Government, was that Altria only acquired a speculative possibility of assuming the traditional benefits and burdens of ownership.

In this context, Altria's proposed "practical certainty" instruction would have precluded the jury from considering a view of the substance and economic realities of the transactions that had a substantial basis in the evidence.  Consider a hypothetical that the jury may well have concluded accurately reflected the most likely ex ante view of how the transactions would unfold.  If there was a seventy percent chance the purchase option would be exercised, a twenty percent chance the assets would be worthless at the end of the renewal term, and a ten percent chance the deals would unwind pursuant to subsequent agreement of the parties, the exercise of the purchase option would not be certain, but the jury might well conclude that the likelihood of exercise, when considered with the totality of relevant circumstances, justified its conclusion that ownership of the facilities had not passed to Altria.  Altria, however, says that the jury should have been instructed that a finding that exercise of a purchase option was likely but not certain required the jury to conclude that Altria acquired a depreciable interest in the facilities.  But an instruction to this effect would have been error, because it would have removed a genuine factual issue from the jury's consideration.  The fact that certainty of exercise may be all but dispositive in some cases (such as *BB&T Corp. v. United States*, *supra* and *AWG Leasing Trust v. United States*, *supra*), hardly renders an evaluation of the

likelihood of exercise irrelevant to a proper weighing of all the benefits and burdens of ownership in other cases.[10]

Residual value.  Altria next argues that the Court should have instructed the jury to disregard the present value of the residual interest Altria stood to acquire through the transactions.  Among other things, Altria contends that "the present value measure offered by the government"— which showed that the discounted value of the residual as one to three percent of the total value of the transaction as of the closing date—"is not supported by any logical purpose."  (Altria Mem. 53.)

At the outset, it is worth noting that Altria did not contemporaneously request a limiting instruction, and that the Court's charge closely followed a general instruction Altria proposed.  (*Compare* Charge to the Jury 34 ("Whether, at the time the transaction began, it was reasonable to expect that the facility would have meaningful value at the end of the leaseback that Altria could benefit from.") *with* Altria's Proposed Charge No. 18 ("Whether, at the time the transaction began, it was reasonable to expect that the facility would have a meaningful value at the end of the leaseback term . . . .").)  Altria did request that the Court instruct the jury that "[a]n expected residual value greater than or equal to 10 to 20% of the facility's value at the time that the transaction began is sufficient for Altria to satisfy this factor."  (Altria's Proposed Charge No. 18.)  But this charge improperly implies that the jury was to apply a mechanical, five-factor test instead

---

[10] *See Wells Fargo & Co. v. United States*, *supra*, 91 Fed. Cl. at 75 (applying totality of circumstances test).  In *Consolidated Edison Co. v. United States*, *supra*, the Court of Federal Claims applying a totality of circumstances test found that the subject LILO transaction had economic substance, 228 Fed. Cl. at 338-341.  As the court in *Wells Fargo* noted, (91 Fed. Cl. at 85), the facts in *Consolidated Edison* presented a "distinctly unique case."

of examining the substance and economic realities of the transactions, and therefore was properly rejected.

In any event, the Court remains unpersuaded that the jury should have been precluded from considering the Government's present value argument on the ground that it served "no logical purpose." Generally, courts in leasing cases have analyzed an asset's residual value in order to determine "whether the purported lessor maintained the risk of economic depreciation and the benefit of appreciation at the end of the lease term." *Kwiat v. Commissioner*, 64 T.C.M. 327, 333 (1992); *see also Frank Lyon*, 435 U.S. at 584 (Stevens, J., dissenting) ("The question whether a leasehold has been created should be answered by examining the character and value of the purported lessor's reversionary estate."). As one commentary notes, consideration of uninflated residual value (Altria's preferred measure) "ignores both an inflation factor, which would provide an approximation of the actual amount to be received from selling or releasing the equipment upon expiration of the lease, and a discount factor, which would provide a measure of the relative importance of the residual value to be realized at the end of the lease term." Simonson, *supra*, at 4. While the uninflated measure "provides a workable approximation of the residual value," "one could argue about whether the same rate should be used for both the inflation and discount factors." *Id.* at 5.

The Government's discounting exercise provided just such an argument; it was intended to show that, relative to the other economic features of the transactions, Altria did not obtain a substantial economic interest in the assets that would appreciate or depreciate during the head lease tail. Certainly aspects of the analysis were open to challenge; and in fact, Altria vigorously cross-examined the Government's experts

concerning the conclusions that properly could be drawn from a present-value analysis.
(Tr. 1772-73, 1787-99.)  The analysis, however, properly sought to illuminate the
transactions' "substance and economic realities," *Frank Lyon*, 435 U.S. at 582,
particularly the relative importance of the residual values nominally Altria stood to
receive, and therefore was a proper object of the jury's consideration.

**3.      The Effect of the Jury's Finding that Altria Did Not Acquire a
         Depreciable Interest in the Assets**

A final question concerning the substance-over-form doctrine concerns the effect
of the jury's finding that Altria did not acquire a depreciable interest in the assets.  Altria
contends that even if it did not acquire a depreciable interest, it incurred genuine debt and
transaction expenses.  It therefore concludes that whichever party is entitled to claim
depreciation deductions, it is entitled to deductions for interest and transaction expenses.
(Altria Mem. 64-66.)

Beginning with interest expenses, the Second Circuit has held that interest
expenses incurred in a transaction that lacks economic substance are not deductible.  *Lee
v. Commissioner*, 155 F.3d 584, 586 (2d Cir. 1998).  In the Court's view, there is no
principled reason why this rule should not also apply to a transaction that tries, and fails,
to transfer a depreciable interest in an asset.  The "interest" deductible under §§ 162(a)
and 163(a) of the Code has long been defined as "compensation for the use or
forbearance of money."  *Deputy v. du Pont*, 308 U.S. 488, 498 (1940).  Where a
transaction designed to transfer a depreciable interest in an asset fails to do so, the
predicate of the deduction—a legally recognized "use" for the borrowed funds—is
absent.  In such a transaction, the taxpayer stands in essentially the same position as a
taxpayer that has borrowed funds to engage in a transaction lacking economic substance;

although the taxpayer is legally obligated to repay the debt, its use of the debt is so far beyond the intent of the Code that it cannot support the deduction.  *See BB&T*, 523 F.3d at 476 (disallowing interest-expense deduction on substance-over-form grounds); *AWG Leasing Trust*, 592 F. Supp. 2d at 994 (same).  *See also Goldstein v. Commissioner*, 364 F.2d 734, 741 (2d Cir. 1966) ("[T]he deduction is proper if there is some substance to the loan arrangement beyond the taxpayer's desire to secure the deduction.").

As for transaction expenses, § 162(a) of the Code authorizes a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."  In the Court's view, a finding that a transaction did not transfer a depreciable interest compels the conclusion that it did not involve "ordinary and necessary expenses."  *Cf. du Pont*, 308 U.S. at 496.  Accordingly, the Court rejects Altria's contention that it is entitled to interest and transaction-expense deductions regardless of whether it acquired a depreciable interest in the assets.

## B.     Economic Substance

Turning to the economic substance doctrine, Altria contends that it is entitled to judgment as a matter of law because it established that it expected to receive a non-tax-based return of 2.5% to 3.8% from the transactions.  (Altria Mem. 21-26.)  As a corollary, Altria maintains that evidence of the discounted present value of future cash flows generated by the transactions is irrelevant to whether it acted with a legitimate business purpose.  (Altria Mem. 27-28.)  This argument is academic in light of the jury's determination that Altria did not acquire a depreciable interest in the assets, and the Court' comments below are dicta.[11]  Nevertheless, the Court, in an excess of caution,

---

[11] Altria contends that any error in the Court's economic substance instruction carried over to the substance-over-form charge.  (*See* Altria Reply Mem. 24.)  But that

finds it appropriate to briefly explain why its economic substance instruction properly reflected the law.

The economic substance doctrine permits the Commissioner to disallow deductions arising out of transactions that do not "appreciably affect [a taxpayer's] beneficial interest except to reduce his tax."  *Knetsch v. United States*, 364 U.S. 361, 366 (1960) (quoting *Gilbert v. Commissioner*, 248 F.2d 399, 411 (2d Cir. 1957) (L. Hand, J., dissenting)).  Under the doctrine, a claimed deduction may be disallowed if a transaction "has no business purpose or  economic effect other than the creation of tax deductions." *Nicole Rose Corp. v. Commissioner*, 320 F.3d 282, 284 (2d Cir. 2003) (quoting *DeMartino v. Commissioner*, 862 F.2d 400, 406 (2d Cir. 1988)).  As understood by the Courts of Appeals, the doctrine has two components: "business purpose" and "economic effect."  The business purpose inquiry "concerns the motives of the taxpayer in entering the transaction;" it asks whether the taxpayer's "sole motivation" for entering a transaction was to realize tax benefits.  *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 92 (1985).  The economic effect inquiry "requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits."  *Id.* at 94.

---

contention is something of a non sequitur.  While both instructions used the words "business purpose," the Court purposefully omitted the concept of "economic substance" from its substance-over-form instruction, which overwhelmingly conveyed that the jury was to determine "[w]hether Altria obtained a genuine ownership interest (or in the case of MTA, a genuine leasehold interest) in the facilities, so that it is entitled, as owner, to tax deductions for depreciation (or amortization in the case of MTA) . . . ."  (Charge to the Jury 31.)  Thus for reasons explained above, *see supra* § II.A.3, the jury's determination that Altria did not acquire a depreciable interest in the assets is sufficient to support judgment in favor of the Government.

1.      **A Flexible Analysis**

The Court begins with the question of whether it was appropriate to consider whether Altria acted with a bona fide business purpose once it established that it stood to earn a non-tax-based return.  As Altria accurately notes, the opinions of the Courts of Appeals reflect a degree of disagreement as to whether a transaction must satisfy both the business purpose and economic effects tests to support a deduction.  While some courts have held that a transaction can fail for lack of either business purpose or economic effect, others have suggested that the Government may only disallow a deduction if a transaction lacks both a legitimate business purpose *and* an economic effect.  *Compare, e.g.*, *Boca Investerings P'ship v. United States*, 314 F.3d 625, 631 (D.C. Cir. 2003) ("[W]hile taxpayers are allowed to structure their business transactions in such a way as to minimize their tax, these transactions must have a legitimate non-tax avoidance business purpose to be recognized as legitimate for tax purposes."), *with Rice's Toyota World*, 752 F.2d at 91 ("To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, *and* that the transaction has no economic substance because no reasonable possibility of a profit exists." (emphasis added)); *see generally* Jeff Rector, *A Review of the Economic Substance Doctrine*, 10 Stan. J.L. Bus. & Fin. 173 (2004) (summarizing decisions and arguing that semantic differences in doctrine have little practical significance).

For substantially the reasons explained by Judge Arterton in *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004), *aff'd*, 150 Fed. App'x 40 (2d Cir. 2008), the Court understands Second Circuit law to require an analysis under which the factfinder *must* consider both aspects of the economic substance inquiry, and

*may* (but need not) find against the taxpayer if a transaction lacks either a legitimate business purpose or an economic effect.  As Judge Arterton noted, the Circuit's most detailed opinion on the question, *Gilman v. Commissioner*, 933 F.2d 143 (2d Cir. 1991), endorsed the Tax Court's application of a "flexible" analysis that considered whether a prudent investor would have entered into the challenged transaction apart from tax benefits.  *Gilman* thus suggests, without holding, that "consideration of business purpose and economic substance are simply more precise factors to consider in the application of [a] traditional sham analysis" focused on "whether the transaction had any practical economic effects other than the creation of income tax losses."  *Long Term Capital Holdings*, 330 F. Supp. 2d at 171 n.68 (quoting *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir. 1990)).  *See also Long Term Capital Holdings*, 330 F. Supp. 2d at 172-73 ("The Second Circuit rejected the taxpayer's contentions that (1) the relevant standard for determining economic substance is whether the transaction may cause any change in the economic positions of the parties (other than tax savings) and (2) that where a transaction changes the beneficial and economic rights of the parties it cannot be a sham.").

This understanding of Second Circuit precedent is consistent with *Frank Lyon*'s teaching that the parties' allocation of rights and duties should be respected for tax purposes if "there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, *and* is not shaped solely by tax-avoidance features that have meaningless labels attached . . . ."  *Frank Lyon*, 435 U.S. 561, 583-84 (emphasis added).  It also is consistent with the Circuit's leading decision in *Goldstein*, which approved

disallowance if a challenged transaction "can not with reason be said to have purpose, substance, or utility apart from [its] anticipated tax consequences."  364 F.2d at 740.

Altria does not directly challenge this understanding of Second Circuit law (*see* Altria Mem. 16 n.1), but it contends that the business purpose inquiry becomes superfluous if a transaction generates "substantial non-tax based profit"—here, non-tax-based profits of between 2.5% and 3.8%.  (Altria Mem. 27).  Thus, even in a transaction that otherwise appears to be dominated by tax-avoidance motives, the presence or absence of a legitimate business purpose becomes irrelevant upon a showing of a substantial economic effect.  (*Id.*)  Depending on how one interprets this argument, Altria is advocating either an evidentiary presumption, whereby proof of economic effect irrebutably demonstrates business purpose, or a substantive legal rule, under which business purpose becomes irrelevant once an economic effect is established.  The Court is not persuaded that either argument does, or should, reflect the law.

Beginning with the evidentiary argument, it is indeed strange that an investor would act solely out of tax avoidance in entering into a transaction that combined tax- and non-tax-based sources of profit.  But to put the point mildly, there are other strange features to the transactions in this case (consider the Vallei transaction, in which an American manufacturer of consumer goods acquired a facility used to treat sewage), and there was an ample evidentiary basis to support the jury's finding that Altria acted *solely* out of tax avoidance.  Absent a compelling reason to disregard this evidence, the Court is at a loss as to why Altria's business purpose should be determined via an evidentiary presumption instead of actual evidence.

Turning to the substantive legal argument, the Court acknowledges that some authority supports Altria's position. *See, e.g.*, *Rosenfeld v. Commissioner*, 706 F.2d 1277, 1282 (2d Cir. 1983).[12] But for reasons that have already been explained, the better reading of Second Circuit precedent is that a transaction may fail for lack of a legitimate business purpose *or* economic effect. *See supra* p. 39. This understanding makes good sense. By reading the business purpose inquiry out of the economic substance analysis, Altria would encourage shelter designers to incorporate just enough non-tax-based profit into a transaction to avoid economic-substance scrutiny, even in essentially wasteful transactions that are beyond any reasonable understanding of the activity Congress sought to promote by enacting specific deductions. Interestingly, this appears to have happened in this case; no one has offered a good explanation for why Altria entered into the transactions, aside from its expectation of a net profit that barely exceeded the then-prevailing risk-free rate. Yet, the substantial spread between the tax- and non-tax-based sources of profits in the transactions (five percent, on average), as well as the contemporaneous documentary record, overwhelmingly suggest that the transactions served little practical purpose beyond reducing Altria's tax liabilities.

Concededly, an understanding of the economic substance doctrine that allows transactions to be held invalid for lack of a legitimate business purpose has the undesirable side effects of generating litigation and introducing uncertainty into tax-

---

[12] Altria also maintains that no case has disallowed tax benefits for lack of a business purpose where the underlying transaction satisfied the economic effect component of the economic substance doctrine. (Altria Mem. 27.) The decided cases generally address transactions that generated a loss, although certain profit-generating transactions in *ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998), and *Sheldon v. Commissioner*, 94 T.C. 738 (1990), appear to been held invalid solely for lack of a legitimate business purpose. *See ACM P'Ship*, 157 F.3d at 258; *Sheldon*, 94 T.C. at 769.

motivated transactions.  But as the D.C. Circuit has cogently explained, the alternatives

are worse:

> It is uniformly recognized that taxpayers are entitled to structure their
> transactions in such a way as to minimize tax.  When the business purpose
> doctrine is violated, such structuring is deemed to have gotten out of hand,
> to have been carried to such extreme lengths that the business purpose is
> no more than a façade.  But there is no absolutely clear line between the
> two.  Yet the doctrine seems essential. A tax system of rather high rates
> gives a multitude of clever individuals in the private sector powerful
> incentives to game the system.  Even the smartest drafters of legislation
> and regulation cannot be expected to anticipate every device.  The
> business purpose doctrine reduces the incentive to engage in such
> essentially wasteful activity, and in addition helps achieve reasonable
> equity among taxpayers who are similarly situated—in every respect
> except for differing investments in tax avoidance.

*ASA Investerings P'ship v. Commissioner*, 201 F.3d 505, 513 (D.C. Cir. 2000).

Furthermore, the parade of horribles that Altria predicts if such an understanding

is adopted—that every leveraged lease will be subject to invalidation, that the

Commissioner will deny deductions for home mortgage interest, and so forth—is unlikely

to materialize.  (*See* Altria Mem. 13.)  Leaving aside the Government's limited

enforcement resources, the economic substance doctrine simply has no application if it is

clear that a claimed deduction is within the intent of a provision of the Code.  *See, e.g.*,

*Sacks v. Commissioner*, 69 F.3d 982, 991 (9th Cir. 1995) ("Absence of pre-tax

profitability does not show 'whether the transaction had economic substance beyond the

creation of tax benefits,' where Congress has purposely used tax incentives to change

investors' conduct." (citation omitted)).  Accordingly, the Court concludes that the jury's

finding that Altria lacked a legitimate business purpose for entering the transactions, even

if at the limits of what present doctrine allows, was sufficient to support its economic

substance verdict.

2.     **The Relevance of the Present Value of Future Cash Flows**

The foregoing conclusion leaves Altria with a secondary argument—that the present value of the future cash flows it stood to receive through the transactions was irrelevant to whether it acted with a bona fide business purpose.

Under Federal Rule of Evidence 401 "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  As noted above, the business purpose inquiry asks whether the taxpayer acted out of a legitimate business purpose, or was motivated solely by tax avoidance.  Present value analysis, in turn, seeks to determine whether an investment's expected returns exceeds the costs of pursuing the investment, including the investor's cost of capital.  *E.g.*, Richard A. Brealey, Stewart C. Myers, & Franklin Allen, *Fundamentals of Corporate Finance* cp. 7 (9th ed. 2008).

Such analysis easily meets Rule 401's liberal test of relevancy.  If the present value of an investment's net returns is barely positive and the present value of its pretax returns is negative, a reasonable factfinder may find it "less probable" that the investor was motivated by a legitimate business purpose.  Alternatively, the factfinder might conclude from the fact that a transaction is cashflow negative on a pretax basis that the tax avoidance was the primary, perhaps the only, factor motivating the transaction.

Altria contends that allowing the factfinder to draw this inference is inconsistent with the principle that mere consideration of tax benefits provides no basis for disallowing a claimed deduction.  *See, e.g.*, *Commissioner v. Brown*, 380 U.S. 563, 579-80 (1965) (Harlan, J., concurring).  But the objection is misplaced, at least where, as here, the jury was specifically charged that "[a] transaction lacks economic substance if it has

*no* business purpose or economic effect other than the creation of tax deductions."

(Charge to the Jury 38; *see also id.* ("For each transaction, you should ask: Was Altria's

*sole* motivation for purchasing (or in the case of MTA, leasing) and then leasing back the

facility to achieve large tax deductions during the early years of the subleases?")

(emphasis added)).

Altria also contends that consideration of the present value of cash flows

generated by the transactions is inconsistent with the profit test under the "economic

effect" component of the economic substance doctrine.  But this depends on a false

dichotomy—that realizing transactional profit is the only legitimate objective a business

may pursue.  And again, the Court's instructions specifically addressed Altria's concern,

providing that the objective prong is satisfied if a transaction is profitable on a cash in-

cash out basis.

Altria finally argues that this approach is inconsistent with the Tax Court's about-

face on the utility of present-value analysis in *Hilton v. Commissioner*, 74 T.C. 305

(1980), and *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985).  But in *Hilton*, the

court considered whether the *objective* prong of the economic substance doctrine required

a particular threshold of profit, not whether a factfinder could consider such evidence as

part of its business purpose inquiry.  *See Hilton*, 74 T.C. 353 n.23.  Thus, the Court does

not find the Tax Court's dueling dicta controlling here.

## C.    Altria's Motion for a New Trial

As noted, Altria moved in the alternative for a new trial.  Aside from issues that

have already been addressed, Altria contends that it is entitled to a new trial because the

Court erroneously excluded evidence that it relied on Revenue Procedure 75-21, and the

testimony of an IRS agent who participated in the audit of its corporate tax returns.

Altria maintains that its reliance on Revenue Procedure 75-21 provides factual context as to why it structured the transactions in the manner in it did.  (Altria Mem. 81-82).  Altria contends that the IRS agent's testimony, which would have shown that the Commissioner views defeasance as a "red flag," "would have significantly narrowed the issues for trial, or at least put in context for the jury all of the government's other criticisms of the transactions."  (*Id.* at 83-84)

Neither argument has merit.  The question at trial was not whether Altria thought it was complying with the law, thus Altria's reliance on indicia of ownership identified in Revenue Procedure 75-21 was immaterial.  Both parties, moreover, were afforded a full and fair opportunity to advance their views concerning the appropriate indicia of ownership.  As for the IRS agents' testimony, both parties spent considerable time drawing out the differences (or absence of differences) between the challenged transactions and traditional leveraged leases.  The IRS agent's testimony would simply have confused the jury in an already complex trial, and therefore was properly excluded.

## III.   CONCLUSION

For the foregoing reasons as well as those noted on the record, Altria's motions for judgment as a matter of law and a new trial **[144, 149]** are denied.  The parties are requested to advise the Court as to the status of No. 08 Civ. 3144, *Altria Group, Inc. v.*

*United States of America* within 90 days. The Government is directed to submit a proposed form of judgment consistent with this opinion and the jury's verdict.


SO ORDERED.


Dated: New York, New York
     March **16**, 2010

                                     Richard J. Holwell
                                     United States District Judge

## APPENDIX A



(PX 242, at OGL13407.)